978 So.2d 1062 (2008)
STATE of Louisiana, Appellee
v.
Chadwick WRIGHT, Appellant.
No. 42,956-KA.
Court of Appeal of Louisiana, Second Circuit.
March 5, 2008.
*1066 Louisiana Appellate Project by W. Jarred Franklin, for Appellant.
Robert W. Levy, District Attorney, A. Shawn Alford, Assistant District Attorney, for Appellee.
Before CARAWAY, PEATROSS & LOLLEY, JJ.
PEATROSS, J.
Defendant, Chadwick Wright, was convicted by a jury of second degree murder and the trial court sentenced him to life imprisonment without benefit of parole, probation or suspension of sentence. Defendant now appeals. For the reasons stated herein, the conviction and sentence of Defendant are affirmed.

FACTS
Defendant, Christopher Hill and Monjeral Foster met at the Lincoln Motel where Foster was staying because they had planned to commit a home invasion and armed robbery at the residence of Freddezzio Ferguson. Two weeks earlier, Defendant bought drugs from Ferguson. They decided to target him because they expected him to have drugs and money and because they did not think he would be able to report them to police due to his own illegal activities. During the early morning hours of January 22, 2003, the three men drove in a pickup truck to Ferguson's house in Bernice and walked around the house looking through windows to see if anyone was awake. Defendant was armed with a Colt .45 caliber semiautomatic pistol, Hill was armed with a 9-mm rifle and Foster was armed with a 12-gauge shotgun. After putting on masks and gloves, Defendant kicked in the front door and yelled, "police, get down, get down." Ferguson had fallen asleep in the living room while looking through catalogs when the three armed gunmen burst into his house. Adrianne Andrews, Ferguson's girlfriend, was asleep in their bedroom with their one-year-old child, and a three-year-old and six-year-old were also asleep in another bedroom. Hill came into the bedroom with a pistol and told Adrianne not to move while Defendant and Foster were kicking and punching Ferguson. Ferguson asked them, "What did I do, man, what did I do?" The gunmen kept saying that they wanted it all and asked for Ferguson's cell phone and gun; Ferguson told them he did not have a gun because he was on probation. Adrianne then realized that the gunmen were not actually police.
As Defendant and Foster brought Ferguson back to the bedroom at gunpoint, they knocked him to the ground and demanded drugs and money. Ferguson told Adrianne to give them all the money in the closet, which was approximately $1,500 that was kept in a jacket pocket, and Adrianne gave it to them; Ferguson told them he did not have any drugs. The older children were allowed to join Adrianne in the bed, and the gunmen were yelling at her to keep them quiet because they were crying. The gunmen continued beating Ferguson with their weapons, telling him it was not enough, while Ferguson was begging them not to hurt his family. Ferguson offered to take them to another location where they could get more money and drugs, and the gunmen agreed. Defendant and Foster then left with Ferguson in Ferguson's car while Hill stayed with Adrianne and the children to make sure she did not call the police. Defendant and Foster told Hill that, if they were not back in 20 minutes, he knew what to do. At this point, Hill and Foster switched guns so that Hill now had the 12-gauge shotgun and Foster had the 9-mm rifle; Hill sat on a stool with a shotgun across his lap while waiting for them to return.
*1067 Foster drove Ferguson's car while Ferguson and Defendant rode in the back seat; Defendant was armed with the Colt .45 caliber semiautomatic pistol, and Ferguson was giving Foster directions of where to go. While Foster was driving, Ferguson grabbed Defendant's gun and they wrestled over it. Foster testified that he pulled the car over and turned around to help Defendant, but that, when he swung around his 9-mm rifle, Ferguson grabbed the barrel of the rifle. Foster testified that, when he and Ferguson were wrestling over the 9-mm rifle, it went off and shot Defendant. At one point, Ferguson was struggling with both Foster and Defendant over both guns. Foster testified that he and Ferguson continued to struggle over the 9-mm rifle, and Ferguson was halfway out of the car at that time. Foster testified that, in the meantime, Defendant was trying to unjam his pistol and was beating Ferguson with the pistol. While Defendant was beating Ferguson with the pistol, the pistol discharged and wounded Foster. Foster testified that soon after getting shot, he lost consciousness; Foster testified that Defendant woke him and told him to move over and then Defendant drove them back to Ferguson's house.
When Defendant and Foster returned in Ferguson's car, Defendant beat on the door, told Hill to "come on," and all three left in a truck. The three men first went to Rodney Young's house in Ruston, where they called an ambulance for Foster, who was taken to Lincoln General Hospital. Foster testified that, when he woke up in the hospital, he originally told police he had been wounded in a drive-by shooting and gave them a false name because he knew he was wanted for a parole violation. In the meantime, Hill left the truck at an apartment complex in Grambling and hid the guns in an abandoned trailer on his parents' property. Rodney Young, who had originally agreed to participate in the robbery but backed out because he was friends with Ferguson, took Defendant to a hospital in Shreveport.
After the gunmen left, Adrianne called her mother and went to Ferguson's car, where she saw his shoe and blood all over the car; Adrianne then called police. At approximately 5:00 a.m., Kathy Tucker, the owner of C.D.'s Restaurant in Bernice, noticed as she pulled into the driveway of the restaurant that a grease barrel had been overturned and then noticed a body lying behind it. After flagging down a neighbor and telling him what she saw, the neighbor went to look; the neighbor came back and told her to call 911 because it was Ferguson and that police had been looking for him. An autopsy later revealed that Ferguson died from a combination of multiple gunshot wounds to the chest and abdomen and blunt force trauma to the head that caused three skull fractures. Dr. James Traylor, a forensic pathologist, testified that Ferguson sustained 11 wounds to his head and that, with the exception of the graze wound to his arm, the gunshot wounds were sustained outside the car.
Bernice Police Officer Eric Henderson secured the scene, and officers from the Union Parish Sheriff's Office collected evidence and photographed the crime scene, which contained four spent .45 caliber shell casings, projectiles, blood and skid marks. When Ferguson's body was removed from the scene, a malfunctioned .45 caliber round was found underneath his body. Two spent 9-mm cartridge cases were recovered from inside Ferguson's vehicle. The weapons used by Defendant, Hill and Foster were recovered at 436 Garr Road in Grambling, with two of them being found inside the house and one being found behind the house. An expert in firearms identification from the North *1068 Louisiana Crime Laboratory determined that the bullet recovered from Ferguson's body was fired by the Colt .45 caliber semiautomatic pistol, which was admitted as State's Exhibit 14; that the .45 caliber bullet recovered from Ferguson's car had also been fired by the Colt .45 caliber semiautomatic pistol; and that the two spent 9-mm cartridges recovered from Ferguson's car were fired by the 9-mm rifle, which was admitted as State's Exhibit 16.
Detective Trey Fulton testified that evidence at the crime scene indicated that more than one person had been shot. Detective Fulton testified that Erica Mayfield went to see Foster at the hospital, and she gave them information that led to the discovery of Foster's real name and Hill's involvement with Foster. The investigation ultimately developed Defendant as a suspect, and Detective Fulton learned that Defendant had sustained a gunshot wound and that Defendant had turned himself in to Shreveport Police. Defendant gave a statement to Detective Fulton, and this statement was played for the jury.[1] In this statement, Defendant said it was a "big accident." Defendant admitted to the robbery and home invasion being planned, that he was armed with a .45 automatic, that everybody got shot when they were all fighting over the guns, that Ferguson fell out of the car and that they drove away. Defendant stated that he did not intend to kill Ferguson, but that Ferguson would not "stop the struggle." Defendant stated that the robbery was his idea, his plan and that he was the main shooter, but that the shooting was an accident.
Defendant admitted at trial that he had three prior felony convictions and that he had participated in the home invasion at Ferguson's residence. Defendant testified that he did not plan to shoot Ferguson or to take him away from his house and that the only reason they took him was because Ferguson offered to take them to another place for drugs. Defendant further testified that he fell asleep in the back seat and that Ferguson went after his gun at that time, which led to them wrestling over the gun. According to Defendant, Ferguson got the gun and tried to fire it, but it did not fire because it was not cocked. Defendant testified that he then threw up his hands, but that Ferguson cocked the gun. Defendant maintained that it was not necessary for Ferguson to shoot him, that he could have just talked to him, but that he started fighting back at that point. He explained that, when Foster turned around to help him fight off Ferguson, Foster accidentally pointed the gun at Defendant's chest; Defendant also testified that it was he, not Ferguson, who was wrestling with Foster over the 9-mm rifle when it shot Defendant. Defendant ultimately related that he did not know how Ferguson got shot, but that he thought the pistol discharged when they were struggling over it and that he "lost control" after getting shot and that it was possible for Foster to have shot Ferguson. Defendant claimed that he did not tell investigators about Ferguson taking the gun from him and trying to shoot him because they did not ask him that question; Defendant testified that he told investigators that the shooting was an accident.
Christopher Hill later pleaded guilty to attempted armed robbery. Monjeral Foster pleaded guilty to armed robbery, and his conviction was affirmed by this court in State v. Foster, 42,212 (La.App. 2d Cir.8/15/07), 962 So.2d 1214. As previously stated, based upon the evidence presented, the jury unanimously convicted Defendant of second degree murder.

*1069 DISCUSSION

Assignment of Error Number One (verbatim): There is insufficient evidence to prove the guilt of Defendant for the offense of second degree murder beyond a reasonable doubt.
Defendant argues that the evidence is not sufficient to support his conviction because the State did not prove beyond a reasonable doubt that he did not act in self-defense. Conceding that there is no question regarding the fact that he shot and killed Ferguson, Defendant argues that he withdrew from the conflict when Ferguson gained control of his gun and he put his hands in the air. In the alternative, Defendant argues that conviction should be reduced to manslaughter because the shooting occurred in "sudden blood heat of passion" because Ferguson was fighting for the gun. The State argues that Defendant's claim of self-defense is self-serving and absurd in light of the evidence.
The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, reviewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra. In the absence of internal contradictions or irreconcilable conflict with physical evidence, the testimony of one witness is sufficient support for a requisite factual conclusion if that witness is believed by the trier of fact. State v. Jones, 31,613 (La.App. 2d Cir.4/1/99), 733 So.2d 127, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434, citing State v. Ford, 28,724 (La. App. 2d Cir.10/30/96), 682 So.2d 847, writ denied, 99-0210 (La.5/14/99), 745 So.2d 12.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight, not the sufficiency, of the evidence. State v. Allen, 36,180 (La.App. 2d Cir.9/18/02), 828 So.2d 622, writ denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747. When the direct evidence is *1070 thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Barakat, 38,419 (La.App. 2d Cir.6/23/04), 877 So.2d 223, citing State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, supra. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Barakat, supra, citing State v. Anderson, 36,969 (La. App. 2d Cir.4/9/03), 842 So.2d 1222. To convict a defendant based upon circumstantial evidence, it must exclude every reasonable hypothesis of innocence. State v. Barakat, supra, citing La. R.S. 15:438.
La. R.S. 14:30.1(A) provides, in pertinent part:
Second degree murder is the killing of a human being: (1) when the offender has the specific intent to kill or to inflict great bodily injury; or (2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . aggravated burglary, aggravated kidnapping, second degree escape, . . . armed robbery, first degree robbery, second degree robbery, simple robbery, . . . even though he has no intent to kill or to inflict great bodily harm.
The trial court instructed the jury on both intentional murder and murder committed during the perpetration of an aggravated burglary, armed robbery or aggravated kidnapping. According to La. R.S. 14:10(1), "specific intent" is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Further, the specific intent to kill may be inferred by the trier of fact from the circumstances, such as discharging a firearm at close range to the victim. State v. Wilson, 40,767 (La.App. 2d Cir.8/23/06), 938 So.2d 1111, writ denied, 06-2323 (La.4/20/07), 954 So.2d 159, cert. denied, ___ U.S. ___, 128 S.Ct. 275, 169 L.Ed.2d 201 (2007).
The projectile recovered from Ferguson's body was fired by Defendant's gun, and Foster had already passed out from his own gunshot wound at the time Ferguson was shot. Thus, the State presented sufficient evidence from which a reasonable jury could determine that Defendant shot Ferguson. Given the evidence of the armed home invasion where Defendant and his accomplices were seeking money and drugs and the subsequent taking of Ferguson to another location, the State presented evidence from which a reasonable jury could determine that Defendant intentionally shot Ferguson or that he did so while engaged in an aggravated burglary, armed robbery or an aggravated kidnapping. Thus, the State presented sufficient evidence from which a reasonable jury could determine that Defendant committed second degree murder when he shot and killed Ferguson.
Defendant also concedes that there is no question regarding the fact that he shot and killed Ferguson. Even so, Defendant argues that he was acting in self-defense when he did so. When self-defense is raised as an issue by a defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Garner, 39,731 (La.App. 2d Cir.9/8/05), 913 So.2d 874, writ denied, 05-2567 (La.5/26/06), 930 So.2d 19. Self-defense is justification for a killing only if the person committing the homicide reasonably believes that he is in imminent danger of losing his life or receiving great bodily *1071 harm and that deadly force is necessary to save his life. La. R.S. 14:20 B(1); State v. Dooley, 38,763 (La.App. 2d Cir.9/22/04), 882 So.2d 731, writ denied, 04-2645 (La.2/18/05), 896 So.2d 30; State v. Cotton, 25,940 (La.App. 2d Cir.3/30/94), 634 So.2d 937. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. State v. Spivey, 38,243 (La.App. 2d Cir.5/12/04), 874 So.2d 352; State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982).
Further, as set forth in La. R.S. 14:21, "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." State v. Lathan, 41,855 (La.App. 2d Cir.2/28/07), 953 So.2d 890, citing State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.1993), writ denied, 93-2054 (La.2/11/94), 634 So.2d 371. When a defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Wilson, 42,440 (La.App. 2d Cir.9/19/07), 965 So.2d 992, citing State v. Matthews, 464 So.2d 298 (La.1985).
In the case sub judice, Defendant alleges that he withdrew from the conflict when Ferguson gained control of the gun and he put up his hands and that the killing was then done in self-defense. Defendant and his accomplices were unquestionably the aggressors in this offense. Defendant did not tell investigators that he tried to withdraw from the conflict by putting his hands up when Ferguson gained control of the gun; rather, the only evidence of this supposed withdrawal was his own self-serving testimony. The fact that Ferguson fought back against two armed gunmen and may have temporarily gained control over a firearm does not constitute a withdrawal on the part of Defendant. Although both Defendant and Foster were shot during the struggle with Ferguson, it was Defendant and Foster who shot each other through their own ineptitude; Ferguson did not actually shoot them. Ferguson was actually struggling with Foster over the 9-mm rifle when Defendant was beating Ferguson in the head with the .45 caliber pistol and, later, Defendant shot Ferguson twice with that same pistol. Since Defendant was the aggressor and there is no evidence that Defendant withdrew from the conflict in good faith and in such a manner that Ferguson would have known his intention to withdraw, Defendant is not entitled to claim self-defense.
In the alternative, Defendant argues that the conviction should be reduced to manslaughter because he killed Ferguson in "sudden blood heat of passion" when Ferguson was fighting for the gun. In pertinent part, La. R.S. 14:31(A)(1) defines manslaughter as a "homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by *1072 provocation sufficient to deprive an average person of his self-control and cool reflection." State v. Ellis, 42,286 (La.App. 2d Cir.7/11/07), 961 So.2d 636, writ denied, 07-1641 (La.1/25/08), 973 So.2d 753. "Sudden passion" and "heat of blood" are mitigating factors in the nature of a defense; and, when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. State v. Baker, 41,555 (La.App. 2d Cir.8/15/07), 962 So.2d 1198, citing State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). The burden is on the defendant to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood." State v. Robinson, 32,794 (La.App. 2d Cir.3/1/00), 754 So.2d 311, writ denied, 00-0989 (La.3/23/01), 787 So.2d 1008. The defendant is not obligated to establish the factors affirmatively; the jury may infer them from the evidence presented. State v. Ellis, supra, citing State v. Jackson, 34,076 (La.App. 2d Cir.12/6/00), 774 So.2d 1046.
Provocation shall not reduce a homicide to manslaughter if the jury finds that the defendant's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. State v. Ellis, supra. "If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act." State v. Leger, supra. Questions of provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person with ordinary self-control. State v. Leger, supra, citing State v. Deal, 00-0434 (La. 11/28/01), 802 So.2d 1254, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). Physical threats or actions on the part of the victim have been found to be sufficient provocation. State v. Ellis, supra, citing State v. Lombard, 486 So.2d 106 (La.1986); State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied, 508 So.2d 64, 65 (La.1987). Even so, mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter. State v. Mitchell, 39,202 (La.App. 2d Cir.12/15/04), 889 So.2d 1257, writ denied, 05-0132 (La.4/29/05), 901 So.2d 1063, citing State v. Massey, 535 So.2d 1135 (La.App. 2d Cir. 1988).
Although Defendant had been shot during the struggle with Ferguson, he was actually shot by his accomplice, Foster. Further, when a victim is fighting back against two armed gunmen, actions of self-defense are not provocation to reduce a charge of second degree murder to manslaughter. Defendant fatally shot Ferguson during the perpetration of an aggravated burglary, armed robbery and aggravated kidnapping. Neither the fact that Ferguson acted in self-defense, nor the fact that Defendant was shot by his accomplice constitutes provocation to reduce the charge of second degree murder to manslaughter. Defendant, therefore, did not meet his burden of proving that he killed Ferguson while acting in "sudden passion" or "heat of blood;" and, thus, he is not entitled to a reduced verdict of manslaughter.
This argument is, therefore, without merit.
Assignment of Error Number Two (verbatim): Defendant's confession was not freely and voluntarily given.
Defendant argues that his statement to police was not freely or voluntarily given because detectives made statements leading him to believe that he would receive assistance with his charges, that the officers would contact the district attorney on his behalf and that he would be able to put *1073 all of it behind him if he made a statement. The State simply argues that this claim has no merit.
Shreveport Police Detective Kevin Goodwin was interviewing Defendant on January 31, 2003, at the Caddo Correctional Center in regard to a burglary in Shreveport. Detective Goodwin testified that he advised Defendant of his Miranda rights and that Defendant waived them and gave a statement in regard to the burglary. Detective Goodwin testified that, after concluding the statement on the burglary, he asked Defendant why people in Union Parish wanted to talk to him and that Defendant told him he "got in a mess up there." After reminding Defendant of his rights, Detective Goodwin testified that he listened to Defendant briefly and then contacted detectives from Union Parish. Union Parish Detectives Trey Fulton and Don McClanahan drove to Shreveport to conduct an interview. Detective Fulton testified that he again advised Defendant of his Miranda rights and that Defendant indicated that he wanted to talk to them without a lawyer. Detective Fulton and Detective Goodwin testified that Defendant did not appear to be on drugs or alcohol and that no promises, threats or other coercion were used to obtain the statement.
The transcript of the statement indicates that Detective Fulton explained the Miranda rights to Defendant and that Defendant was willing to talk to them. At the beginning of the interview, the following exchange transpired:
Unknown[2]: Hey Chad, let me interrupt you for just a second. Remember what we talked about earlier?
CW: About our case?
Unknown: Yeah, about our case. And, I talked to you about a little bit of something on the side? Help yourself right now; let him know what went down, okay.
TF: I'm not talking about this past week. I'm talking about the week before.
Unknown: I mean Chad, get this mess over, okay. Do you know where it's leading, okay, if you don't? Let's get it over with; be honest with the guy. Tell him what you told me; don't be afraid. You're a man. You gotta deal with it. If not, you know what you are looking at. And, I don't want to see you go down like that. You're smarter than that man, alright? That Tuesday night in Ruston, where did y'all stay at? Where were you staying?
TF: I've talked to Monjeral, okay. And, he has told me.
Unknown: Get all this stuff behind you. There ain't no sense in getting in a bind.
CW: Just don't know how to explain it.
TF: The truth.
Unknown: You ain't got to explain it cause we can't, you can't explain it. Tell the truth. What you told me. Now these guys are trying to see where they can help you.
TF: I believe, Monjeral told us what happened  his version, okay. I believe there is someone else involved other than you and Monjeral also. And, we want to identify that person, okay? But, I need to know, you're [sic] version of how that happened, okay.
(State's Exhibit 24). Detective Goodwin continued to encourage Defendant to tell *1074 the truth. After Defendant stated that he would tell them the truth on one condition, Detective McClanahan informed Defendant that they could make him no promises:
CW: You know what? I'm gonna be straight with ya'll.
Unknown: Okay.
CW: But, it's only on one condition might I tell ya'll what you want to know, on one condition.
McClanahan: Okay. I'm not going to lie to you; I can't make you any promises, okay. I mean, I'll do what I can, but I can't make you a bunch of promises. So, go ahead and ask me what you want to know.
CW: All I want to know is, you know what I'm saying, is this a mercy on me and my cousin, you know what I'm saying? Cause the whole thing wasn't nothing but a big accident.
McClanahan: Okay. Okay. We want to know. Let me tell you the truth. Do you want me to lie to you or tell you the truth? Is that correct?
CW: Sure.
McClanahan: Okay, Look at me straight in the face. Look at me. I cannot promise you anything. None of these men can promise you anything. I will say this to you, that mercy, first, when this is all over with first thing you need to do it [sic] make it right with God; you know what I'm saying. You believe that don't you?
CW: Uh huh.
McClanahan: And, ask God for mercy in this situation. And, you always have the option to ask the courts for mercy, okay. But, I'm not going to sit up here and tell you something that I cannot deliver. You know what I'm saying to you? The first thing, when this is all over with, you need to make it right with God. And, you know that I'm telling you the truth, don't you? The only way you can get through this thing, and you know this as well as I do, is to tell the truth. That's the only thing, is to tell the truth. And, tell us. I think you mentioned it was an accident or whatever. Well we want to know the details as to how it came about and everything. So that's what I'm trying to explain to you.
(State's Exhibit 24). Defendant went on to give a statement to the detectives.
Defendant testified that Detective Goodwin told him that he would talk to the district attorney for him, that Detective Goodwin told him that it was not as if he killed a preacher or anyone valuable to the community and that the detectives talking about God made him open up because he grew up in church. Defendant admitted that his rights were explained to him, but testified that he did not pay attention to it. Defendant testified that the detectives got inside his head and changed his emotions and that he was powerless. Defendant also testified that, just before detectives turned on the tape recorder, he told them that he did not want to talk about this.
Detective Goodwin denied offering to speak to the district attorney on Defendant's behalf and explained that he told Defendant to help himself by telling the truth because he believes a person can feel better by being honest. Detective Goodwin also stated that, when he told Defendant that the other detectives were trying to help, he meant that they would try to help if he had not done anything wrong.
In State v. Ross, 42,399 (La. App. 2d Cir.8/29/07), 965 So.2d 610, this court set forth the general law in regard to reviewing a trial court's pretrial ruling on a motion to suppress a statement:

*1075 In reviewing the correctness of the trial court's pretrial ruling on a motion to suppress, the appellate court may review the entire record, including testimony at trial. State v. Young, 39,546 (La.App.2d Cir.03/02/05), 895 So.2d 753, citing State v. Sherman, 04-1019 (La.10/29/04), 886 So.2d 1116.
At a hearing on a motion to suppress a confession the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La. App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288. See La. C. Cr. P. art. 703.
Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Bowers, 39,970 (La.App.2d Cir.8/19/05), 909 So.2d 1038; State v. Roddy, supra. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Bowers, supra; State v. Roddy, supra.

The question of voluntariness of a confession, including a determination of the defendant's state of mind, must be resolved from the facts and circumstances of the particular case. State v. Demming, 40,033 (La.App.2d Cir.9/21/05), 911 So.2d 894.
The admissibility of a confession is a question for the trial court. When determining admissibility, the trial court's conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, U.S. cert. denied; State v. Dailey, 607 So.2d 904 (La.App. 2d Cir.1992). Also, State v. Brown, XXXX-XXXX (La.4/12/05), 907 So.2d 1. Great weight is placed upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Thibodeaux, supra; State v. Roddy, supra. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, supra; State v. Henderson, 31,986 (La. App.2d Cir.8/18/99), 740 So.2d 240.
As a matter of federal constitutional law, any confession must be considered involuntary and inadmissible if it is obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. State v. Demming, supra.
In analyzing whether statements made by police were promises that render a statement involuntary, this court has previously stated the following:
A confession obtained by direct or implied promises, however slight, or by the exertion of any improper influence must be considered involuntary and inadmissible. State v. Morvant, 384 So.2d 765 (La.1980). A remark by the police telling the defendant that the officer will "help" or "do what he can or things will go easier" will not negate the voluntary nature of the confession. State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, 2000[-]1427 [,] (La.5/11/01), 791 So.2d 1288; State v. English, 582 So.2d 1358 (La.App. 2d Cir. 1991), writ denied, 584 So.2d 1172 (La. 1991). Further, informing a defendant that the district attorney will be advised of any cooperation is insufficient to overcome the free and voluntary nature of a confession. State v. Vernon, 385 So.2d 200 (La.1980); State v. Jackson, 523 *1076 So.2d 251 (La.App. 2d Cir.1988), writ denied, 530 So.2d 565 (La.1988).
State v. Holloway, 37,021 (La.App. 2d Cir.5/16/03), 847 So.2d 200, writs denied, 03-1720 (La.12/19/03), 861 So.2d 558 and 03-1929 (La.12/19/03), 861 So.2d 560. This court has also held that "statements by police to a defendant that he would be better off if he cooperated are not `promises or inducements designed to extract a confession.'" State v. Allen, 41,548 (La. App. 2d Cir.11/15/06), 942 So.2d 1244, writ denied, 07-0530 (La.12/7/07), 969 So.2d 619, citing State v. Petterway, 403 So.2d 1157 (La.1981); State v. Dison, 396 So.2d 1254 (La.1981). Further, "a mild exhortation to tell the truth, or a remark that if the defendant cooperates the officer will `do what he can' or `things will go easier,' will not negate the voluntary nature of a confession." State v. Blank, 04-0204 (La.4/11/07), 955 So.2d 90, cert. denied, ___ U.S. ___, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). Statements of this sort are not considered improper promises or inducements because they "are more likely musings not much beyond what this defendant might well have concluded for himself." State v. Demming, supra.
The record in the case sub judice clearly shows that Defendant was expressly told that the officers could make him no promises. The statements encouraging Defendant to help himself out by telling the truth are permissible as mild exhortations to tell the truth, not improper promises as Defendant alleges. Thus, there is no merit to Defendant's claim that his statement was rendered involuntary due to promises made by investigators.
Assignment of Error Number Three (verbatim): The sentence imposed is excessive for this offense and this offender.
Defendant argues that his life sentence without benefit of parole, probation or suspension of sentence is constitutionally excessive for his conviction of second degree murder, despite it being the mandatory minimum sentence for the offense, because it is grossly disproportionate to the offense and serves no purpose other than the needless imposition of suffering. We disagree.
Since Defendant failed to file a motion to reconsider sentence, he is limited on appeal to a bare claim that the imposed sentence is unconstitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993). In reviewing claims of excessive sentence, generally, an appellate court uses a two-step process. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. Second, whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). Even so, when there is a mandatory sentence, such as a sentence of life imprisonment without benefit of parole, probation or suspension of sentence for a conviction of first degree murder, there is no need for the trial court to justify a sentence under La. C. Cr. P. art. 894.1 when it is legally required to impose that sentence. State v. Wilson, 938 So.2d at 1146. Further, the mandatory life provisions of La. R.S. 14:30 have consistently been upheld as constitutional and do not violate the federal and state constitutional provisions prohibiting cruel, unusual or excessive punishment. State v. Sims, 32,461 (La.App. 2d Cir.10/27/99), 745 So.2d 151, writ denied, 99-3384 (La.5/12/00), 762 So.2d 11, citing State v. Toomer, 395 So.2d 1320 (La.1981).
By arguing that the mandatory life sentence is excessive, Defendant is essentially *1077 arguing that the trial court should have made a downward departure from the mandatory sentence required by La. R.S. 14:30.1. In State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, the Louisiana Supreme Court explained the circumstances in which a downward departure from the mandatory minimum habitual offender sentence is warranted, finding that it is rare and only warranted under exceptional circumstances. In those cases, the sentencing judge must begin with the presumption that the mandatory minimum sentence is constitutional. State v. Johnson, 709 So.2d at 676, citing State v. Dorthey, supra. The court may only depart from the minimum sentence if it finds that the defendant presented "clear and convincing evidence" to rebut that presumption of constitutionality, which requires a showing that "`[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.'" State v. Johnson, 709 So.2d at 676, quoting State v. Young, 94-1636 (La. App. 4th Cir.10/26/95), 663 So.2d 525, writ denied, 95-3010 (La.3/22/96) 669 So.2d 1223 (Plotkin, J., concurring).
Applying the reasoning from State v. Johnson, supra, to the present case, there is no justification for a sentence less than life imprisonment without benefit of parole, probation or suspension of sentence. Defendant did not present any evidence at the sentencing hearing to show that his circumstances were exceptional or that he was the victim of the legislature's failure to assign sentences meaningfully tailored to his culpability, to the gravity of his offense or to the circumstances of his case. After imposing sentence, the trial court noted that the mandatory life sentence was especially appropriate under the facts of the present case:
Even though the sentence is mandatory under the law, it is most [sic] than justified by the particularly heinous facts of this case, by your extensive criminal record and by your lack of remorse. You invaded someone's home while armed with a gun and threatened a man, his wife and several children. The victim was beaten about the head. The criminal activity of robbery and home invasion was deliberately planned in advance. Your family understandability [sic], in the letters that they submitted, request mercy for you but I note that you showed no mercy for Mr. Ferguson. You deprived Mr. Ferguson's wife and children and his parents and other relatives of the support and companionship of their loved one. You placed at risk more than one person by your activity, were armed with a dangerous weapon and it appears that you have a history of criminal behavior with at least three prior felonies. So when I consider all of this, I find that this sentence  a lesser sentence would deprecate the seriousness of the offense and is warranted in every respect.
Since Defendant has not shown that his case is exceptional and warrants a rare departure from the mandatory minimum sentence under La. R.S. 14:30.1, the sentence was not excessive, and the trial court properly sentenced Defendant to life imprisonment without benefit of parole, probation or suspension of sentence. This assignment is without merit.

CONCLUSION
For the foregoing reasons, the conviction and sentence of Defendant, Chadwick Wright, are affirmed.
AFFIRMED.
NOTES
[1] A transcript of this recording was admitted into evidence as State's Exhibit 24.
[2] Detective Goodwin testified that he was the person identified as "Unknown" in the transcript.