BLEICH, J. (Ad Hoc)
This criminal appeal arises from the 26th Judicial District Court, Parish of Bossier, the Honorable John M. Robinson presiding. Defendant, Jeffery Sanchez Smith, was convicted of manslaughter, in violation of La. R.S. 14:31. Defendant was sentenced to 38 years' imprisonment at hard labor. For the following reasons, Defendant's conviction and sentence are affirmed.
FACTS
Defendant, Jeffery Sanchez Smith, was charged by bill of indictment with the second degree murder of Jeremy Davis, in violation of La. R.S. 14:30.1. A jury trial commenced on April 30, 2018. Teresa Cooper, Defendant's girlfriend, testified that on June 24, 2016, she was living at 1029 Shirley Lane with Defendant and her three sons, Kaderrick Cooper, Jeremy Davis, and Jacoby Smith (her son with Defendant).
Kaderrick Cooper testified that he was present at the Cooper house after 10:00 p.m. on the night of June 24, 2016. Kaderrick stated that he was in his room at the back of the house when Teresa and Defendant came home. He could hear his mother Teresa and brother Jeremy begin arguing. Kaderrick testified that he heard Defendant yell something and then heard a sound "almost like a firecracker." Jeremy ran into Kaderrick's room and hid behind Kaderrick's back. Kaderrick testified that Defendant followed Jeremy into the bedroom and pointed a gun at him. Kaderrick, a former Marine, identified the gun as a chrome-colored .38 pistol.
Kaderrick testified that his mother walked to the bedroom door, and she and *993 Kaderrick tried to subdue Defendant and get him to lower his weapon so Jeremy could leave the room. Kaderrick testified that Defendant overpowered them and shot Jeremy in the back as he attempted to run from the bedroom. Kaderrick stated that he did not see Defendant and Jeremy physically fighting or struggling over a gun at any time. When Kaderrick found out that Jeremy had died, he ran out of the house after Defendant. At that time, Defendant turned around and began shooting at him.
On cross-examination, Kaderrick admitted that Jeremy had pled guilty to misdemeanor battery and spent six months in jail over a fight in which he knocked out some of Kaderrick's teeth.
Teresa Cooper testified that on June 24, 2016, when she and Defendant returned home from his sister's house, she began arguing with Jeremy about a case of water that he had opened. Theresa stated that she was standing in the kitchen, and Jeremy was standing in the living room when the argument began. Teresa testified that, when she told Jeremy that he could not have the case of water, he grabbed her by the neck, pushed her head up against the wall, and choked her. She stated that she heard a gunshot from the back of the house, apparently fired into the ceiling of the living room. Jeremy then ran to Kadderick's room.
Teresa testified that she followed Jeremy into Kaderrick's room and saw Defendant with a gun. Teresa stated that she and Kaderrick attempted to keep Defendant and Jeremy apart, but her son was able to move into the hallway, where Jeremy punched Defendant in the face. At that point, the two men fell to the floor. Teresa testified that she heard a gunshot, and they ran out of the house. She did not actually see the shooting.
Jameisha Gilmore, a cousin of the Coopers, testified that she was in town from Texas visiting her grandmother, Mary Cooper, a neighbor of Teresa Cooper (Mary lives at 1031 Shirley Lane). Jameisha testified that, during the evening, the women heard a commotion and went outside. She saw Defendant walking down the street with a silver gun in his hand. Jameisha stated that she heard Defendant yell, "He shouldn't've been fuckin' with me." She also stated that she could hear, but not see, Kaderrick Cooper, who was outside of the Cooper house. Jameisha testified that she heard Defendant tell Kaderrick, "If you fuck with me I'll kill you too." At that point, Defendant began shooting towards Theresa Cooper's house and Jameisha's aunt made her go back inside the house. Breanna Cooper, who resides at 1033 Shirley Lane, testified that she also witnessed Defendant walking down the sidewalk in the direction of her house with a gun in his hand on the night of June 24, 2016. According to Breanna, Defendant was yelling, but she could not recall what he said. She testified that Defendant stopped approximately two houses away from her home and "opened fire."
Officer Matthew Camp of the Bossier City Police Department testified that, when he responded to the scene, he made contact with Defendant, who was standing on the side of the road near a drainage ditch approximately a block from his house. As Officer Camp approached Defendant, the officer asked Defendant for the gun. Officer Camp testified that Defendant responded, "You'll never find it." Officer Michael Iman of the Bossier City Police Department testified that he approached Officer Camp and Defendant while canvasing for the shooting suspect. Officer Iman testified that he asked Defendant, "Why'd you shoot that guy?" and Defendant's response was, "Well, I told that mother fucker to quit messing with me." Defendant *994 was advised of his Miranda rights, handcuffed, and placed in a vehicle. Officer Iman testified that Defendant continued to make statements as he was transported, but the officer could not recall the exact nature of those statements. Officer Iman's dash cam recording was played for the jury and admitted as State's Exhibit 3. Officers searched the area, but were unable to locate the gun.
Detective Karen McDonald of the Bossier City Police Department testified that Defendant had already been detained when she arrived at the scene. She interviewed Defendant at the Bossier City Police Department. Det. McDonald testified that she informed Defendant of his Miranda rights and identified State's Exhibit 1 as the "rights card" that he signed acknowledging a waiver of those rights. Det. McDonald testified that she did not see any defensive wounds on Defendant during their interview. During the interview, Defendant reported that Jeremy pulled a gun during the argument, they struggled, and the gun went off.
Dr. Frank Peretti, an associate medical examiner and forensic pathologist, testified that he conducted the autopsy of Jeremy Davis. Dr. Peretti testified that he recovered a bullet projectile from Jeremy's right hip area. According to Dr. Peretti, the bullet entered Jeremy's left shoulder region, at the top and back of the shoulder, and there was no exit wound. Dr. Peretti noted that the wound path or trajectory was unusual because its direction was sharply downward, across the body. He testified that he did not see any evidence of powder, burning, or stippling on Jeremy, all of which would all be indications of a struggle or a close proximity shooting. Dr. Peretti testified that he did note two small abrasions, but no other signs of a struggle. He stated that the abrasions could have occurred when Jeremy fell to the ground. A photograph of that projectile was admitted as State's Exhibit 13, the projectile was admitted as State's Exhibit 11, and the autopsy report was admitted as State's Exhibit 16.
Det. McDonald testified that an initial search of the house had been conducted on June 24 and 25, 2016. Detective Steven Durr testified that he photographed the house and collected evidence. Det. Durr stated that he recovered a projectile from between the corner of the hallway and the back bedroom. He also photographed bullet holes in the wall and ceiling of the house. The house was then released to Teresa Cooper and her family.
Det. McDonald obtained a search warrant for the Cooper residence on June 29, 2016. During a search of the master bedroom, a duffle bag, which contained a box of .38 caliber bullets, was found. The bag was admitted as State's Exhibit 7, and the box of bullets was admitted as State's Exhibit 8. Teresa identified the duffle bag as belonging to Defendant, and the bullets as having been stored in Defendant's duffle bag. There were five rounds missing from the box of bullets. Photographs taken by Det. Durr on June 25, 2016, admitted as Defense Exhibits 1-2, showed the duffle bag located on top of a suitcase next to the bed, with some kind of red material on top. A photograph taken during the June 30, 2016 search, admitted as State's Exhibit 9 and Defense Exhibit 4, showed additional items on top of and around the duffle bag. Carla White, a firearms examiner at the North Louisiana Criminalistics Laboratory, testified that both the projectile recovered from Jeremy's right hip and the bullet recovered from the house were .38 caliber.
On May 3, 2018, the jury found Defendant guilty of the responsive verdict of manslaughter. A pre-sentence investigation was ordered. On July 24, 2018, Defendant *995 was sentenced to 38 years' imprisonment at hard labor. Defendant has appealed his conviction.
DISCUSSION
Sufficiency of the Evidence
Through appellate counsel, Defendant argues that the State failed to sufficiently show that Jeremy Davis's death was the result of manslaughter committed by Defendant. According to Defendant, the testimony of Kaderrick Cooper is directly contradicted by the autopsy report and testimony of Dr. Frank Peretti. Defendant notes that Kaderrick testified that he witnessed Defendant shoot Jeremy in the back, while Dr. Peretti testified that the bullet entered Jeremy's shoulder and traveled in a downward angle toward his hip, which would not be possible if both parties were standing. Defendant also notes Teresa Cooper's testimony that there was a struggle between Defendant and Jeremy, while Kaderrick's testimony was that there was no struggle. Defendant argues that, because of the conflicting and irreconcilable differences in the eyewitness testimony and evidence, the State failed to sufficiently prove that he committed manslaughter.
In response, the State asserts that the verdict of manslaughter was supported by the evidence presented at trial. The state argues that the eyewitness testimony of two witnesses, testimony of investigating officers, expert testimony of Dr. Frank Peretti and Carla White, and seizure of a box of .38 caliber bullets from Defendant's room, was sufficient to sustain Defendant's conviction for manslaughter.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 05/20/03), 851 So. 2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Bass , 51,411 (La. App. 2 Cir. 06/21/17), 223 So. 3d 1242. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 02/22/06), 922 So. 2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 01/14/09), 1 So. 3d 833, writ denied , 09-0310 (La. 11/06/09), 21 So. 3d 297.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey , 99-0023 (La. 01/26/00), 775 So. 2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson , 50,643 (La. App. 2 Cir. 06/22/16), 197 So. 3d 717, writ denied , 16-1479 (La. 05/19/17), 221 So. 3d 78. A reviewing court may not impinge on the factfinder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So. 2d 442.
Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).
*996 Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1) ; State v. Smith , supra ; State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So. 3d 129, writ denied , 12-2667 (La. 05/24/13), 116 So. 3d 659. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Smith , supra ; State v. Reed , 45,237 (La. App. 2 Cir. 05/26/10), 37 So. 3d 1116. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Smith , supra ; State v. Jones , 49,396 (La. App. 2 Cir. 11/19/14), 152 So. 3d 235, writ denied , 14-2631 (La. 09/25/15), 178 So. 3d 565.
La. R.S. 14:31 provides in part:
(A) Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard , 486 So. 2d 106 (La. 1986) ; State v. Bratton , 49,434 (La. App. 2 Cir. 01/14/15), 161 So. 3d 937, writ denied , 15-0303 (La. 11/20/15), 180 So. 3d 317 ; State v. Williams , 44,977 (La. App. 2 Cir. 01/27/10), 32 So. 3d 902, writ denied , 10-0368 (La. 09/24/10), 45 So. 3d 1071. The appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Smith , 49,839 (La. App. 2 Cir. 05/20/15), 166 So. 3d 416, writ denied , 15-1244 (La. 06/03/16), 192 So. 3d 753.
Physical threats or actions on the part of the victim have been found to be sufficient provocation. State v. Wright , 42,956 (La. App. 2 Cir. 03/05/08), 978 So. 2d 1062, writ denied , 08-819 (La. 10/31/08), 994 So. 2d 532. Even so, mere words or gestures, no matter how insulting, will not reduce a homicide from murder to manslaughter. State v. Free , 48,260 (La. App. 2 Cir. 11/20/13), 127 So. 3d 956, writs denied , 13-2978 (La. 05/30/14), 140 So. 3d 1174, 14-0039 (La. 09/19/14), 148 So. 3d 944 ; State v. Wright , supra.
Defendant was charged with second degree murder, but convicted by a jury of the responsive verdict of manslaughter. His arguments focus on the inconsistencies *997 between the eyewitness testimony and the physical evidence. However, when viewing the evidence in light most favorable to the prosecution, a rational trier of fact could have found the essential elements of manslaughter proven beyond a reasonable doubt.
Teresa Cooper testified that the incident began with an argument between herself and her son Jeremy. She stated that Jeremy grabbed her by the neck, slammed her head against the wall, and choked her. Their argument was loud enough that her older son Kaderrick could hear it in his bedroom. There was testimony that Defendant interceded in the argument by firing a gun in the hallway, then following Jeremy into Kaderrick's bedroom, where the two men began arguing. Kaderrick testified that Jeremy had a violent past and stated that the two men often argued.
Dr. Peretti testified that the bullet entered Jeremy's back left shoulder and traveled downward to lodge in his right hip. Although Dr. Peretti was unable to state how the two parties may have been positioned at the time of the shooting, he did opine that they could not both have been standing based on the bullet's path, and opined that Jeremy could have been lying down or crouched over during a possible struggle. This testimony contradicted Kaderrick's testimony that Defendant shot Jeremy in the back as he ran away. Kaderrick also reported that he did not witness a struggle between Defendant and his brother, while Teresa testified that there was a struggle in the hallway during which the two men fell to the floor. Teresa's testimony was supported by that of Dr. Peretti.
Although the gun was not recovered by officers, a box of bullets matching the projectiles recovered from the scene and from the victim's body was recovered from Defendant's bedroom. Defendant argues that anyone could have placed the bullets there, as they were not located until five days after the shooting and because items surrounding the duffle bag had been moved. However, there is no evidence that the duffle bag had been moved or tampered with, and the officers had no reason to search Defendant's bedroom on the night of the shooting because they were looking for a weapon which had been taken from the home by Defendant.
The totality of the evidence, even taking into consideration the minor inconsistencies in the testimony of Teresa and Kaderrick, was sufficient to establish that an argument occurred, and that Defendant shot Jeremy Davis, causing his death. Officers testified to, and audio recordings established, Defendant's admissions of guilt on the night of the shooting. Based upon their verdict of manslaughter, the jury clearly found that the defense had shown that the shooting occurred in "sudden passion" or the "heat of blood." Because the State proved beyond a reasonable doubt the elements of the offense of manslaughter, this assignment of error is without merit.
Pro Se Assignment of Error
According to Defendant, his Sixth Amendment right to an unbiased and fair trial was violated when the State engaged in "trial by ambush" by failing to turn over all information and witnesses during discovery. Defendant argues that the state failed provide sufficient, prior pre-trial notice of Officer Michael Iman's testimony. He also contends that the free and voluntary hearing, which was conducted after the commencement of trial, was too late to provide proper notice of Officer Iman's damaging testimony. Specifically, Defendant contests the admission of Officer Iman's testimony regarding Defendant's statement to Officer Iman that, "I told that mother fucker to stop messing with me." He argues that, without the testimony of *998 Officer Iman, the State failed to prove that he was guilty of anything except justifiable homicide. Defendant further argues that the State also failed to provide a 40-minute dash cam video in pre-trial discovery.
The rules of discovery are intended to eliminate unwarranted prejudice arising from surprise testimony, to permit the defense to meet the state's case, and to allow proper assessment of the strength of its evidence in preparing a defense. However, the failure of the state to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown. State v. Harris , 00-3459 (La. 02/26/02), 812 So. 2d 612 ; State v. Campbell , 46,888 (La. App. 2 Cir. 03/14/12), 86 So. 3d 204, writ denied , 12-1059 (La. 10/26/12), 99 So. 3d 641.
La. C. Cr. P. art. 716(B), in pertinent part states that:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
In State v. Thomas , 39,194 (La. App. 2 Cir. 01/26/05), 892 So. 2d 161, writ denied , 05-0646 (La. 06/03/05), 903 So. 2d 455, the defendant complained that the state failed to give notice that it planned to use four oral inculpatory statements and that the trial court erred in allowing the admission of these statements. Thomas contended that he was prejudiced in that, because he did not know the state had this evidence, he rejected a plea offer of manslaughter which would have resulted in a less than lifetime sentence. The state contended that it had no obligation to tell the defendant who its witnesses were. This Court found that Thomas's argument that he might have entered a guilty plea to manslaughter had he been aware of these statements was purely speculative. The record showed that Thomas had been provided with a list of witnesses the state planned to call, and knew that several of those witnesses had been present when the shooting occurred.
During his testimony at trial, Officer Iman testified that, at the time of his arrest, Defendant said, "Well, I told that mother fucker to stop messing with me, and whatever else." Defendant argues that Officer Iman did not recall anything else that was discussed at that time, Officer Iman did not recall who read Defendant his Miranda rights, the dash cam video did not record this statement, and none of the surrounding officers had their body cameras turned on or activated.
A motion for discovery was filed by the defense on June 28, 2016, requesting the names of any witnesses and their statements. Supplemental answers to that motion show that the defense was provided with DVD's, crime scene video, dispatch calls, and photographs. A motion to determine that Defendant's statement was free and voluntary was filed on August 29, 2017, and a hearing was initially set for September 12, 2017. On March 9, 2018, the trial court ruled that statements made to Det. Karen McDonald were freely and voluntarily given, and a hearing on the statements made to Officer Michael Iman was set for April 30, 2018.
There is no evidence that Defendant or his counsel was unaware of Officer Iman or what statements he might testify to. Defendant was aware of the statements he had made to Officer Iman, the State turned over numerous DVD's, and a motion for a free and voluntary hearing as to *999 the statements made to Officer Iman was filed on August 29, 2017, well before the start of trial.
On May 2, 2018, following the start of trial and prior to Officer Iman's testimony, the free and voluntary hearing was conducted. The trial court found that Defendant's statement to Officer Iman was freely and voluntarily given. The fact that this hearing was not conducted until after the start of trial is insufficient, on its own, to show prejudice to Defendant. This assignment of error is without merit.
CONCLUSION
For the reasons set forth above, Defendant's conviction and sentence are affirmed.
AFFIRMED.