745 So.2d 151 (1999)
STATE of Louisiana, Appellee,
v.
Carl G. SIMS, Appellant.
No. 32,461-KA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1999.
*154 Louisiana Appellate Project by J. Wilson Rambo, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, Walter E. May, District Attorney, Clifford R. Strider, III, Asst. Dist. Atty., Counsel for Appellee.
Before BROWN, WILLIAMS, KOSTELKA, JJ.
KOSTELKA, J.
A jury found Carl G. Sims ("Sims") guilty as charged of first degree murder, La. R.S. 14:30, but did not unanimously agree on the sentence. The trial court sentenced Sims to life in prison. Sims appeals his conviction and sentence. We affirm.

FACTS
At approximately 4:15 a.m. on October 10, 1993, Ray McGee, ("McGee") a truck driver, went into Gas Express, a combination convenience store and gasoline station, in Homer, Louisiana, to buy coffee. After speaking with the clerk, Dennis Mosley ("Mosley"), he exited the store and walked back to his truck. While he walked, he noticed a man wearing a light-colored jacket walking toward him in the parking lot. Because of the early hour, McGee was concerned for his safety and watched the man closely as he approached. After McGee finally made his way safely to his truck, he noticed the man walk toward the store entrance. McGee later identified this man as the defendant, Carl Sims.
Freddie Shelton ("Shelton") found Mosley stabbed to death behind the counter in Gas Express. The cash register drawer was opened and empty. Shelton called police at approximately 4:25 a.m. A light-colored jacket with blood on it was found in a nearby creek. Police focused their investigation on Sims when an anonymous tip later that day connected him with the crime.
That same morning Lori Kirkpatrick ("Kirkpatrick") and Victoria Brooks[1] ("Brooks") had seen Sims in a light-colored jacket walking the street in close proximity to Gas Express at approximately 3:45 a.m. On the day of the crime Kimberly Hamilton[2] ("Hamilton"), Sims' sister, made contact with police and went to the police station where she identified the bloody jacket as belonging to her. Hamilton cried when she made the identification. Sims lived with his sister and her then boyfriend, Terry Harper ("Harper"), at the time of the crime.
When interviewing Sims, the police found human blood on one of his tennis shoes. Harper found a missing knife hidden in a laundry basket at Hamilton's home. The knife was later determined to *155 contain human tissue. It was also determined that Sims washed his clothes at some point after he arrived home and before 9:00 a.m on the day of the crime.
Sims was arrested on October 10, 1993, and later indicted for the first degree murder of Mosley. After conviction, this appeal ensued.

DISCUSSION

MOTION TO QUASH FOR FAILURE TO RECORD PROCEEDINGS
In assignments of error numbers one and six, Sims constitutionally challenges the grand jury indictment charging him with first degree murder.
Sims contends that he has been denied his rights to judicial review based upon a complete record of all evidence upon which the judgment is based, to a fair trial, to confront and cross-examine his accusers and to present a defense, because the grand jury proceedings which he claims "may" have revealed "unduly suggestive identification procedures" during the presentation of evidence were not recorded. Sims argues that he cannot obtain the "evidence necessary to carry his burden of proof with regard to the suppression of identification ...." and is being deprived of his right to judicial review of this evidence because the proceedings were not recorded. Accordingly, he prays that the indictment be quashed.
Grand jury proceedings are not meant to be adversarial proceedings. They provide the accused the right to an independent determination of probable cause. Sound policy considerations support the rule that grand jury proceedings are to be kept secret. State v. Williams, 310 So.2d 528 (La.1975), cert. denied, 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 572 (1993). The grand jury proceeding is a separate institution from the remainder of the criminal justice system which is not bound by the procedural and evidentiary safeguards provided by the various constitutional amendments. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); State v. Williams, supra.
The indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity. While there may be instances in which a party's need for grand jury materials outweighs the need for continued secrecy, that need must be demonstrated with particularity. Furthermore, a general wholesale request for transcripts does not satisfy the requirement of demonstrative particularized need. United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). The Louisiana Supreme Court has followed basically the same approach in determining whether to permit discovery of grand jury transcripts. State v. Trosclair, 443 So.2d 1098 (La.1983).
Grand jury testimony can be disclosed for statutory irregularities or perjury before the grand jury. La.C.Cr.P. art. 434(A).
To strike a balance between the accused's right to confront his accusers and the state's interest in maintaining secrecy, the Supreme Court has authorized an in camera inspection of grand jury transcripts to determine whether they may be used for impeachment purposes. Ultimately, however, disclosure is within the trial court's sound discretion. State v. Barker, 628 So.2d 168 (La.App. 2d Cir. 1993), writ denied, 93-3194 (La.03/25/94), 635 So.2d 236.
We find no abuse of discretion in the trial court's denial of Sims' motion to quash the indictment. The subjects of Sims' Motion to Suppress Identification were the procedures utilized in the identification of a jacket and a photographic lineup procedure.[3] His claim, that his rights were violated by the failure to record the *156 proceedings, are made in a conclusive statement in his motion to quash that "unduly suggestive identification procedures were employed during the presentation of evidence before the grand jury." In brief, he more generally states that "unduly suggestive identification procedures may have been employed during the presentation of evidence...." We cannot find these generalized and conclusive statements sufficient to satisfy the threshold requirement of a showing of particularized need required to override the indispensable secrecy of grand jury proceedings. See State v. Richardson, 31,931 (La.App.2d Cir.09/22/99), ___ So.2d ___. Accordingly, Sims has failed to show how the absence of transcribed proceedings prejudiced his constitutional rights.
Moreover, even with Sims' constitutional right to a complete review of the record, he is not entitled to relief when this right has been prejudiced by his own act or omissions. State v. Ford, 92-2029 (La.App. 4th Cir.01/31/95), 650 So.2d 808. The record before us shows that Sims rejected the state's offer to have the trial court conduct an in camera examination of witnesses to determine if there was any testimony which might assist him. Indeed, such a resolution would have accomplished the same balance sought by the courts between the accused's right to confront his accusers and the state's interest in maintaining secrecy through the in camera inspection of transcribed proceedings. Moreover, La.C.Cr.P. art. 434 allows a grand jury witness to discuss his testimony with counsel for the person indicted. Sims' rejection of both of these safeguards disqualifies him for relief.

MOTION TO QUASH-SELECTION OF GRAND JURY FOREPERSON
Sims also claims error in the trial court denial of his motion to quash the indictment based upon an unconstitutional procedure by which the jury foreperson was selected. Sims contends that because the grand jury foreperson was not randomly chosen and that race played a part in the trial court's decision, a constitutional violation of his right to due process occurred.
Regarding the selection of the grand jury foreperson in Louisiana, La.C.Cr.P. art. 413(B) provides in part:
B. [T]he court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury....
Sims challenges the operation of this statute as a deprivation of his procedural right to due process applicable to the states through the Fourteenth Amendment of the United States Constitution.
Statutes are presumed to be valid; whenever possible the constitutionality of a statute should be upheld. State v. Hennis, 98-0664 (La.App. 1st Cir.02/19/99), 734 So.2d 16, writ denied, 99-0806 (La.07/02/99), 747 So.2d 16. The party challenging the statute bears the burden of proving its unconstitutionality. Id. In order to challenge the constitutionality of a statute, the party attacking the statute has a three-tier burden. First, the plea of unconstitutionality must be made in the trial court; secondly, the unconstitutionality of the statute must be specially pleaded; and finally, the grounds for the claim must be particularized. Vallo v. Gayle Oil Co., Inc., 94-1238 (La.11/30/94), 646 So.2d 859; Williams v. Jackson Parish Hospital, 31,492 (La.App.2d Cir.01/13/99), 729 So.2d 620, writ denied, 99-0458 (La.04/01/99), 742 So.2d 558.
In this case, because Sims has raised the issue of the constitutionality of La.C.Cr.P. art 413 in a timely motion to quash, we find the first two requirements have been met. It is for the lack of fulfillment of the third requirement, however, that we find Sims' claim must fall.
*157 We first note that Sims' reliance on Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) is misplaced. Campbell's holding was confined to the issue of whether or not a Caucasian male had standing to raise an equal protection challenge to discrimination against African Americans in the selection of grand jurors. Because no issue of standing has been raised here, Campbell is inapplicable to a resolution of this issue.
Moreover, Campbell's language, comparing Louisiana's method of appointment of the grand jury foreman by the trial judge with the federal system, is not only dicta, which is not binding on this court, but is also presented in the context of an equal protection or discrimination claim. Because Sims has couched his claim solely in terms of a denial of substantive and procedural due process and failed to raise his claim in the context of an equal protection violation at the trial court, he is precluded from doing so on appeal. Vallo, supra. Moreover, he has made no affirmative showing that the system of selection has fostered discrimination, either in his particular case or in a historical context as is required for proof that the method of grand jury selection violated his right to equal protection or due process under both the Louisiana and United States Constitutions. State v. Motton, 395 So.2d 1337 (La.1981), cert. denied, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981).
His remaining bald allegation, that his right to due process was violated by the "direct involvement by the Trial Judge in the selection and appointment of the Grand Jury foreperson rather than that selection or appointment occurring by random allotment," fails to particularize how that process has infected the integrity of the selection process or has otherwise affected in any way his right to fundamental fairness. Moreover, Sims' procedural due process rights are fully protected by the provisions of La. C.C.P. arts. 411(A) and 413(B), which provide for the random selection of both the grand jury venire and the grand jury members. With the court's selection of the foreman being made from that randomly chosen venire, Sims' right to a fair cross section of the community representation remains unimpaired. Accordingly, Sims' claim fails under the third jurisprudential requirement that the claim adequately particularize the grounds outlining the basis of unconstitutionality. Vallo, supra. We, accordingly, find no merit to this argument and affirm the trial court denial of Sims' motion to quash the indictment on these grounds.

MOTION TO SUPPRESS IDENTIFICATION OF JACKET
Sims also argued in his "Motion to Suppress Identification" that "a line up or display of jackets was presented to one or more of several individuals in an attempt to secure an identification of a particular jacket as one associated with [Sims]," and "that only one of the jackets displayed was light colored and the other jackets [were] dark colored."[4] After a hearing on these claims, the trial court denied the motion to suppress the identification of the jacket finding that "there were no unduly suggestive procedures used by the State that would ... make the use of the jacket constitutionally defective...." It is not clear from defendant's brief whether or not he still asserts these claims on appeal. We have however, reviewed the record before us and find no evidence of any such suggestive identification procedures utilized by the state in this case. We find no constitutional violation in these circumstances.

MOTION TO SUPPRESS McGEE'S IDENTIFICATION
Sims alleges that the trial court erred when it allowed identification testimony from Ray McGee. After the morning *158 in the Gas Express parking lot, McGee next saw Sims in the doorway of a coffee room located behind the courtroom. McGee had made no earlier identification of Sims, having declined to participate in a photographic lineup because he did not want to be involved. McGee had been summoned to court by the defense for a motion to suppress, so he was aware that he was at the courthouse for proceedings in the Sims case. But, he did not know for what specific purpose. During the noon recess, McGee was standing alone in the doorway of the coffee room when Sims, dressed in civilian clothes, was brought into the jury room by the bailiff. He did not know the defendant by name nor did he expect to see the defendant there at that time. McGee then identified Sims as the person he saw in the Gas Express parking lot on the morning of the murder.
Pointing to the identification as highly suggestive and the fact that the courtroom event occurred almost three years after the murder, and after McGee had earlier told police he could not identify the individual he saw in the Gas Express parking lot, Sims challenges the identification as unconstitutionally suggestive and unreliable.
We cannot agree. An immediate and definite identification resulting from an inadvertent meeting between a witness and a suspect will be found reliable and admissible where there is no indication of impropriety or suggestiveness. State v. Holmes, 550 So.2d 249 (La.App. 4th Cir. 1989), writ denied, 556 So.2d 56 (La.1990).
In seeking to suppress an identification, the defendant must prove the procedure used was suggestive and that the totality of the circumstances presented a substantial likelihood of misidentification. State v. Martin, 595 So.2d 592 (La.1992).
Even if the identification procedure is suggestive, it will be admissible if, under the totality of the circumstances, it is found to be reliable. State v. Wafer, 31,078 (La.App.2d Cir.09/23/98), 719 So.2d 156, writ denied, 99-1114 (La.10/01/99), 747 So.2d 1137. Several factors are evaluated to determine whether the reliability of an identification may outweigh the suggestiveness of the procedures employed. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The factors are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the victim's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation.
In this case, there is no evidence of, nor does the defense argue, impropriety. Clearly, McGee was in the courtroom only upon defense prompting. The state played no part in securing McGee's presence for the purpose of identifying Sims as the perpetrator of the crime. Nor do we find this identification to have been unduly suggestive. While McGee knew that he was brought to court for the purpose of participating in a court procedure relating to the murder, the unique circumstances surrounding the identification were detached from the accusatorial proceedings wherein the defendant may be more easily identified by his placement in the "defendant's chair" at the defense counsel table. Rather, this identification occurred at recess prior to any proceedings at which McGee would have seen or expected to see Sims. Moreover, Sims was wearing street clothes. Even balancing the suggestiveness inherent in a courtroom setting with the clearly inadvertent but definite identification, we find the overall suggestiveness of the identification to have been minimal.
Moreover, the overall reliability of the identification is strong. McGee had a good opportunity to view Sims in the parking lot of Gas Express. In fact, McGee watched Sims intently as they approached one another from across the lot because he feared for his own safety; he felt that it *159 was rare for anyone to be walking in the parking lot at that early morning hour. The parking lot was well lit. McGee gave the police a fairly detailed description of the individual's height, weight and clothing that generally matched other descriptions of Sims on the night of the murder. McGee testified that when he saw Sims behind the courtroom, he was certain Sims was the person he saw in the Gas Express parking lot that morning. Again, at trial, McGee remained unyielding in his identification of Sims even upon rigorous defense cross-examination.
Accordingly, the only factor weighing against reliability of the identification is the length of time between the parking lot meeting and the confrontation behind the courtroom. When balanced against the strength of the remaining factors, however, the totality of the circumstances does not present a substantial likelihood of misidentification. We find no merit to this argument.

SUFFICIENCY OF THE EVIDENCE
Sims argues the state failed to put forth evidence to exclude every reasonable hypothesis of Sims' innocence beyond a reasonable doubt.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The appellate court must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. State v. Nealy, 450 So.2d 634 (La. 1984); State v. Doby, 540 So.2d 1008 (La. App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989).
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Davis, 92-1623 (La.05/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
Sims argues that the state failed to exclude the reasonable hypotheses that either one Lester Ray Harper or Freddie Shelton killed Mosley.

Lester Ray Harper
Sims' first hypothesis regards an individual named Lester Ray Harper. At trial, a defense witness, Carlene Miller ("Miller"), testified that on a night prior to the crime, she and two male friends went into a wooded area to drink beer and socialize. One of the friends, Lester Ray Harper, loaned Miller a jacket to wear because she was cold. In a photographic lineup prepared by a private investigator hired by the defense, Miller identified a photograph of the jacket that police had seized as looking like the one that Lester Ray Harper had loaned her. Again, at trial, this witness claimed that the jacket seized by police looked like the jacket she had borrowed from Lester Ray Harper. Lester Ray Harper did not testify at trial.
Sims claims that because Kimberly Hamilton testified at trial that the jacket in possession of authorities only looked like a jacket she had previously purchased for her ex-husband and that she did not know when the jacket had been taken from her possession, the state failed to establish beyond a reasonable doubt the jacket seized was hers. Combining Hamilton's and Miller's testimony, Sims claims that the state did not exclude the reasonable hypothesis that Lester Ray Harper was the killer.
*160 Although Kimberly Hamilton stated at trial that the jacket looked like the one that belonged to her, she nevertheless also admitted that on the night after the crime she had clearly identified the jacket as being the one she purchased for her exhusband. It is always the function of the jury to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992). writ denied, 617 So.2d 905 (La.1993). The appellate court should not disturb a rational determination. Id. Here, the jury obviously rejected the trial testimony of Hamilton and accepted, as true, her original statement. Considering Hamilton's voluntary contact with police, the time frame in which the statement was given, and Hamilton's emotional responses at that time, we find this resolution to have been a rational one.
The evidence shows that Miller identified the jacket police seized as looking like the one in the possession of Lester Ray Harper on a night prior to the crime in question. Unlike Kimberly Hamilton, this witness never unequivocally identified the jacket as belonging to Lester Ray Harper. Accordingly, when combined with Hamilton's statement clearly identifying the jacket as belonging to her, it was reasonable for the jury to conclude that the jacket seized by police merely resembled the one that Lester Ray Harper loaned to Miller and was not in fact the jacket worn by the killer. This conclusion is further buttressed by the fact that Miller's experience occurred sometime before the crime and there exists no evidence connecting Lester Ray Harper with the crime on October 10, 1993. Moreover, both the environment where Miller allegedly viewed the jacket and her admitted consumption of alcohol on that night raise questions as to her ability both to remember or adequately describe the jacket. At trial, Miller conveniently recalled that an arm of the jacket was ragged on the night she saw it. Notably, however, the part of the jacket that she described as ragged was the location where police had removed a swatch of the fabric for testing. Under these circumstances, the jury could reasonably reject the hypothesis of innocence that Sims sought to establish through her testimony.

Freddie Shelton
The second hypothesis urged by Sims is that Freddie Shelton, who notified the police of the crime, was the killer because Shelton was at the store at approximately the time of the crime, had the opportunity to commit the crime and had a large sum of money in his pocket at the time he notified the police.
The evidence shows that Shelton traveled with one Johnny Joe Minifield ("Minifield") to Gas Express on two occasions the morning of the murder. The two first stopped at Gas Express so Shelton could purchase cigarettes and a soda. At that time Shelton spoke with Mosley and then exited the store. Shelton and Minifield then traveled, as planned, to Shelton's son's house where they stayed for a very short time. Upon leaving, Shelton remembered that he had forgotten his soda at Gas Express and the two traveled back there to retrieve it. As Minifield waited in the car, Shelton entered the store and found Mosley behind the counter. Shelton called the police at approximately 4:25 a.m. Minifield corroborated Shelton's testimony regarding the two men's travels that morning and the series of events surrounding Shelton's discovery of Mosley. The only evidence linking Shelton to the crime was the fact that he found Mosley that morning. His action immediately after discovery of Mosley certainly supports his credibility. No evidence exists connecting Shelton and the bloody jacket. Moreover, with risk to his own freedom, Shelton explained the cash in his possession was obtained from drug sales. The jury obviously accepted the testimony of this witness and rejected, as unreasonable, the hypothesis that he was, in fact, Mosley's killer. Viewing this evidence in the light most favorable to the state, we cannot find *161 error in the jury's rejection of this alternate hypothesis.
The remaining evidence shows that despite Sims' claim that he remained at his sister's apartment after 2:30 a.m on October 10, 1993, Kirkpatrick and Brooks saw him wearing a light-colored jacket within walking distance of Gas Express at approximately 3:45 a.m. Ray McGee witnessed Sims entering Gas Express at approximately 4:15 a.m. McGee described Sims as wearing a light-colored jacket. Freddie Shelton found Mosley stabbed to death and called police at approximately 4:25 a.m. The cash register drawer was open and empty. A jacket containing blood, consistent with the victim's, was found near Gas Express. Notably, both the blood on the jacket and the victim's blood contained characteristics of sickle cell anemia. That jacket was identified by Sims' sister as belonging to her. Kirkpatrick and Brooks testified that the jacket was like that worn by Sims when they saw him on the morning of the crime. Harper found his missing knife in a laundry basket in the apartment where he lived with Hamilton and Sims. The knife had human tissue on it. Sims washed his clothes between the time he got home and 9:00 a.m. on the morning of the crime. During questioning by police, one of Sims' shoes was found to have human blood on it.
When viewing this evidence in the light most favorable to the state, after excluding every reasonable hypothesis of innocence, we find the evidence sufficient to convince a rational trier of fact that all the elements of first degree murder had been proven beyond a reasonable doubt. We find Sims' argument to be without merit.

EXCESSIVE SENTENCE
In assignments of error numbers four and five, Sims contends that the trial court did not consider the factors in La. C.Cr.P. art. 894.1 and that the sentence imposed was unduly harsh and excessive. We cannot agree.
The record shows that the trial court clearly articulated the sentencing considerations set forth in La.C.Cr.P. art 894.1. Moreover, in light of the fact that the sentence is a mandatory one under the provisions of La. R.S. 14:30, such articulation is not mandated. State v. Koon, 31,177 (La.App.2d Cir.02/24/99), 730 So.2d 503; State v. Williams, 445 So.2d 1264 (La.App. 3d Cir.1984), writ denied, 449 So.2d 1346 (La.1984). Additionally, the mandatory life provisions of La. R.S. 14:30 have consistently been upheld as constitutional and do not violate federal and state constitutional provisions prohibiting cruel, unusual or excessive punishment. State v. Toomer, 395 So.2d 1320 (La.1981). Accordingly, we reject these assignments of error.

CONCLUSION
Finding no merit to Sims' assignments of error, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Now, Victoria Brooks Tidwell.
[2] Now, Kimberly Hamilton Harper.
[3] At the hearing on the motion to suppress, both the state and defendant stipulated that there was never any photographic lineup in this case.
[4] While Sims never argues this claim in his memorandum in support of his motion to suppress, the court nevertheless, in keeping with the original motion, considered evidence on possible identification procedures conducted apart from the grand jury.