PEATROSS, J.
| defendant, Thomas Payne Horn, was convicted of second degree murder and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendant now appeals. For the reasons stated herein, the conviction and sentence of Defendant are affirmed.

FACTS

On December 8, 2006, Defendant was at a house party at Daniel Ray Watlington’s residence located on Canal Street in Shreveport, Louisiana. Watlington informed Defendant and two other men at the party, Domanike J. Flores and Rocky J. Leone, that he had received information that Troy Killough, the victim, was coming to his house with the intention of robbing the occupants therein. Killough arrived shortly thereafter and an argument ensued in the front yard of Watlington’s residence, escalating into a physical altercation between Killough and the four other men.
After the fight, Killough agreed to take Watlington, Leone, Flores and Defendant to a house where the other people who were planning to help him rob Watlington were waiting. Leone drove the men in his white Chevrolet Tahoe to the house. The house was empty upon arrival, however, so Leone continued driving and ultimately entered 1-20, heading westbound toward Greenwood, Louisiana, with the other four men still in the vehicle.
During the drive toward Greenwood, the men riding as passengers in the vehicle began to beat Killough. At one point, Defendant and Killough got into an argument because Killough and a friend of his allegedly slept with Defendant’s girlfriend. While the other men continued to beat him, 12Killough lunged forward and grabbed the steering wheel of the Tahoe. This caused the Tahoe to collide with another vehicle on the interstate. Without stopping, the men turned around in the median and went back eastbound on 1-20. The men then drove to a wooded area off Elysian Fields Road where Killough, who was severely beaten by this time, was taken from the vehicle and dragged up a hill. Defendant then shot Killough twice in the head. Killough’s body was found the following day, December 9, 2006, by Larry *104 Neal, a hunter who was checking the property on which he had a hunting lease.
Over the course of the investigation following Killough’s murder, Defendant was interviewed on two separate occasions, once on December 10, 2006, by lead criminal Detective Michael Escude of the Caddo Parish Sheriffs Office, and a second time on December 11, 2006, by Detective Terry Richardson of the Caddo Parish Sheriffs Office. During the second interview, Defendant admitted to shooting Killough and was subsequently arrested.
On January 18, 2007, a Bill of Indictment was filed charging Defendant with the first degree murder of Troy Killough in violation of La. R.S. 14:30. An amended indictment was subsequently filed on September 24, 2009, wherein Defendant was charged with the second degree murder of Troy Killough in violation of La. R.S. 14:30.1.
On May 29, 2008, Defendant filed a motion to suppress the statements made by him to Detectives Escude and Richardson during the interviews on December 10-11, 2006. An evidentiary hearing on ^Defendant’s motion to suppress was held on July 14, 2008. The State first called Detective Escude who testified that he conducted the interview with Defendant on December 10, 2006, at the Criminal Investigation Division office (“CID office”) after developing his name as a possible witness to the murder.[1]
Detective Escude testified that Defendant told him that he had heard about Killough’s death through some friends and contacted the authorities when he heard they were asking about him. Defendant voluntarily went to the CID office to be interviewed and was not picked up in a police unit. Defendant was not advised of his Mirando[2] rights at this time because he was not being viewed as a suspect, but rather he was being viewed as a witness. Detective Escude testified that he did not force or coerce Defendant into giving a statement, nor did he promise Defendant anything of value in exchange for giving a statement to the investigators. Defendant did not make any statements in reference to Killough’s death or the manner in which he was killed. Consequently, the interview was concluded and Defendant was advised that he was free to leave the CID office.
The State then called as a witness Detective Richardson who conducted a second interview with Defendant on December 11, 2006, after developing information that led detectives to believe that Defendant may have been involved with the murder. Detective Richardson located Defendant at approximately 2:00 a.m. at the Old Salem Apartments and |4asked him to accompany detectives to the CID office for questioning. Defendant voluntarily agreed to do so. Detective Richardson testified that Defendant appeared to be sleepy because the detectives had awoken him, but that he did not appear to be intoxicated or in any type of ill frame of mind.
Prior to conducting the interview, Detective Richardson advised Defendant of his Miranda rights by reading his rights from a “rights sheet” and Defendant signed the sheet indicating that he understood his rights. Detective Jason Morgan was also present during the interview. Detective Richardson testified that neither he nor Detective Morgan threatened or coerced Defendant into giving a statement, nor did they promise him anything of value or leniency in exchange for giving a statement. Detective Richardson also testified *105 that Defendant did not invoke his right to counsel or ask that the questioning be stopped at any time during the interview. Defendant ultimately admitted during the interview to being present at the time Killough was killed, as well as to being the individual who shot Killough twice in the head.
The State did not call Detective Morgan at the hearing on the motion to suppress and the defense did not call any witnesses. On August 19, 2008, the trial judge rendered a ruling denying Defendant’s motion to suppress.
Jury selection began on October 19, 2009. Defense counsel asserted a Batson objection based on the State’s use of peremptory challenges against black jurors. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State countered that defense counsel had not | ¿made a prima facie showing that the State was systematically excluding members of a particular race. Id. Relying on his own statistical calculations of the number of strikes and the number of tentative acceptances of jurors, the trial judge overruled defense counsel’s Batson objection. Id. During “strike backs,” defense counsel renewed its Batson objection and the trial judge overruled the objection, basing his ruling on the totality of the circumstances. Id.
Trial in the matter began on October 22, 2009. The State’s first witness was Larry Neal, the man who had discovered Kil-lough’s body. Neal had a hunting lease in and around the Elysian Fields Road area off Hwy. 80 in Greenwood. Neal testified that, on December 9, 2006, he drove out to check on the leased property because he had problems with trespassers in the past. Neal entered a log road leading off Hwy. 80 and discovered Killough’s body lying there with his pants down to his ankles and his shirt pulled over his head. Neal called 911 and officers from the Greenwood Police Department and the Caddo Parish Sheriffs Office arrived at the scene shortly thereafter.
The State called as its next witness Officer George Shaw of the Greenwood Police Department. Officer Shaw was the first officer to arrive at the scene on the day Killough’s body was found. Officer Shaw observed drag marks from where it appeared that a vehicle had pulled into a drive, stopped and from which Killough’s body was presumably dragged to where it was found. Officer Shaw testified that the Greenwood Fire Department then arrived and medics confirmed that Killough did not have a pulse. ^Officer Shaw secured the scene with crime tape and waited for deputies to arrive. Officer Shaw testified that, at this point, the Caddo Parish Sheriffs Office arrived to take over the investigation and the scene was released to its investigators.
The State also called as a witness William Young, the half brother of Watling-ton. Young testified that, on December 9, 2006, he had a conversation with Defendant during which Defendant told him that he shot Killough. When questioned about Defendant’s demeanor in making these statements, Young replied that Defendant appeared to be “[gjloating like he liked it. Like he did something for himself.”
The State then called Detective Michael Escude of the Caddo Parish Sheriffs Office, who conducted the first interview with Defendant at the CID office on December 10, 2006. As previously mentioned, Detective Escude testified that Defendant requested to speak to detectives because he had heard they were looking for him. When contacted by Defendant, Detective Escude asked him to come to the CID office and he arrived later that afternoon. At this time, Defendant told Detective Es-cude that the night before Killough’s body *106 was discovered, Killough had contacted him because he was “looking to score some marijuana and what they refer to as an eight ball.” Detective Escude testified that, during this interview, he did not have any information linking Defendant to the murder of Killough and was only viewing him as a potential witness. For this reason, Defendant was told he was free to leave the CID office after finishing the interview.
Dr. Frank Peretti, a forensic pathologist from Little Rock, Arkansas, |7aIso testified as a witness for the State. Dr. Peretti performed the autopsy of Killough and recorded in his autopsy report that Kil-lough had sustained two gunshot wounds to the head. Dr. Peretti also noted abrasions on Killough’s back indicating that his body had been dragged. He further noted a black eye and a contusion on Killough’s nose, which he opined to be the result of blunt force injury arising from being beaten. In Dr. Peretti’s final opinion, he concluded that Killough died from a gunshot wound to the head.
The State called as its next witness Do-manike J. Flores. Flores was one of the men present at Watlington’s house party and was also present during the course of events that ultimately led to Killough’s murder. Flores was initially charged with murder when arrested, but entered into a plea agreement with the State wherein he pled guilty to manslaughter. In exchange for his truthful and cooperative testimony, Flores received a sentence of 13½ years with credit for time served.
Flores is friends with Leone, the owner of the vehicle that Leone, Killough, Defendant, Flores and Watlington were riding around in on the night of December 8, 2006. Flores testified that there was a house party that evening at Watlington’s residence and that he and Leone had gone to the house in Leone’s Tahoe to pick up some money from Watlington. Flores testified that the first time he had met Defendant was that night at the party at Wat-lington’s house. Flores testified that there was a discussion among himself, Watling-ton and Defendant about the alleged plans of Killough and some other guys to rob Watlington.
Flores further testified that Killough arrived at Watlington’s house | swith one other person who left while Killough remained. Killough went into the house and asked to buy some “X pills,” at which time Watlington brought it to Leone’s attention that Killough had come to the house with plans to rob them. Flores, Watlington, Defendant, Leone and Killough then went outside and Leone and Killough got into a physical altercation. Soon thereafter, Watlington and Flores joined in the fight. When the fight ended, Killough offered to take Leone, Flores, Watlington and Defendant to the house where his alleged co-conspirators were waiting. The five men got into Leone’s Tahoe and drove to the house, but it was empty. At this point, before driving off, Flores suggested they put Killough out of the vehicle because he was already beaten up, but, instead, Leone continued to drive toward 1-20. Killough had a bloody nose and was in the back seat sitting between Watlington and Defendant.
Flores then testified that the men began heading down 1-20 toward Greenwood, during which time Killough and Defendant began arguing over a female. Defendant accused Killough of sleeping with his girlfriend, but Killough denied it. Defendant responded that he was going to “mere”[3] Killough because Defendant was going to “marry that girl.” Flores testified that he was unaware of the incident that Defen *107 dant was referring to when he accused Killough of sleeping with his girlfriend.
Flores further testified that, at one point, Killough jumped up and grabbed the steering wheel causing the Tahoe to collide with another vehiclé on the interstate. Flores believed that Killough had grabbed the Iswheel in an attempt to escape from the vehicle. When Killough got back into his seat, Watlington grabbed him in a head lock and they began wrestling. Flores then began beating Killough in the side until Killough stopped fighting.
Flores testified that he recalled a conversation among the group in reference to taking Killough to Texas because the manslaughter laws there were a “lot less steep” than in Louisiana, but he could not recall who made the statement. According to Flores, Watlington then told Leone to táke the Love’s exit on 1-20 and the group ultimately pulled off near a wooded area where they stopped and pulled Killough out of the back seat. Defendant and Wat-lington brought Killough around to the back of the vehicle and Leone and Flores proceeded to pull Killough up a hill. Leone and Flores walked back down the hill and Defendant walked up the hill alone with a pistol in his hand. Flores testified that Killough was still breathing when he and Leone were dragging Killough up the hill. Flores testified that he then saw Defendant walk up the hill and “[tjhat’s when I heard the shots.” After the two shots were fired, Leone, Flores, Watling-ton and Defendant got back into the Tahoe and went back to Watlington’s house.
Flores testified that he did not realize that anyone had a gun in the vehicle until the Tahoe collided with the other vehicle on 1-20. Flores testified that, during the collision, he saw the gun fly up between the seats so he picked up the gun and handed it to Defendant. Flores testified that he was 100 percent positive that Defendant shot Killough and, further, that no one in the group pressured Defendant into shooting Killough.
hnThe State then called Detective Terry Richardson of the Caddo Parish Sheriffs Office. Detective Richardson first spoke with Defendant during the interview which took place at the CID office on December 10, 2006. Defendant was released after that interview, but it was later determined that he needed to be further interviewed to determine the truthfulness of his initial statements and to discern any other information relevant to the murder.
In the early morning hours of December 11, 2006, Detective Richardson attempted to reach Defendant by phone, but was unsuccessful, so he went to the Old Salem Apartments, woke up Defendant and asked him to accompany detectives back to the CID office to further discuss Killough’s murder. As previously discussed, Defendant agreed to do so and was transported to the CID office, but was left in possession of his phone and all of his belongings because he was not under arrest at that point.
Detective Richardson then advised Defendant of his Miranda rights and Defendant signed the CID office’s standard Miranda rights form acknowledging that he understood his rights. Detective Richardson testified that Defendant was not coerced in any way and no promises for anything of value were made in exchange for his giving a statement. It was during this interview that Defendant admitted to shooting Killough twice in the head. After Defendant admitted to the shooting, he was placed under arrest for the murder of Killough.
As previously stated, trial of the matter commenced in October 2009 and, at the conclusion of trial on October 26, 2009, a unanimous jury found | ^Defendant guilty *108 as charged of the second degree murder of Troy Killough. Defendant did not file a motion to reconsider sentence; however, on November 6, 2009, he filed a motion for post verdict judgment of modification wherein he alleged that the evidence presented at trial did not support his conviction of second degree murder and, therefore, a conviction of manslaughter should be entered instead. On November 10, 2009, the trial judge denied the post verdict judgment of modification and subsequently sentenced Defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. This appeal ensued.

DISCUSSION

Assignment of Error Number One (verbatim): There is insufficient evidence to prove the guilt of Defendant for the offense of second degree murder beyond a reasonable doubt.
In his first assignment of error, Defendant argues that the State did not prove the elements of second degree murder under La. R.S. 14:30.1, which requires a showing that Defendant killed Killough while possessing specific intent to kill or inflict great bodily harm. Defendant further asserts that the State was .required to, but did not, prove that he shot Killough in the absence of heat of blood and sudden passion.
The State argues that the evidence at trial was sufficient to support a jury verdict finding Defendant guilty of second degree murder. See La. R.S. 14:30.1. The State further contends that Defendant was not sufficiently provoked so as to justify the lesser included offense of manslaughter based on sudden passion or heat of blood. See La. R.S. 14:31; La. C. Cr. P. art. 821.
112The State points to the testimony of Flores who stated that he (Flores) had recovered from the provocation of the alleged intended robbery prior to Killough’s murder. Additionally, the State argues that Killough’s alleged involvement with Defendant’s girlfriend was sufficiently removed by the time Killough was shot and, further, that Killough’s act of lunging forward and grabbing the steering wheel of the Tahoe was an act of self-defense, not provocation.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ de nied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. |13A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913, cert. denied, — U.S. -, 130 S.Ct. 3472, 177 *109 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La. App.2d Cir. 1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. de nied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Second degree murder is defined in La. R.S. 14:30.1, which states in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm[.]
Manslaughter is defined in La. R.S. 14:31, which states in relevant part:
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall 114not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed!.] (Emphasis Added.)
“Sudden passion” or “heat of blood” immediately caused by provocation sufficient to deprive the average person of his self-control and cool reflection are not elements of the crime of manslaughter; rather, they are mitigatory factors in the nature of a defense exhibiting a degree of culpability less than that present when homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993); State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writs denied, 508 So.2d 64,65 (La.1987). Provocation and the time for cooling are questions for the jury to determine according to the standard of the average or ordinary person. State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002).
During the interview with Detective Richardson on December 11, 2006, Defendant admitted to shooting Killough. Defendant also indicated in his recorded statement that he believed Killough was dead before he shot him, but that he shot Killough anyway because he was pressured by the other men to do so. Additionally, Dr. Peretti testified that, in his final opinion, Killough died of a gunshot wound to the head. This finding contradicts Defendant’s alleged belief that Kil-lough was dead before he shot him. Furthermore, codefendant Flores testified that Killough was still breathing when Defendant pulled him out of the vehicle and as he was being |15dragged up the hill and that no one else in the group pressured Defendant into shooting Killough. Accordingly, we find the evidence sufficient to support the jury verdict finding Defendant guilty of the second degree murder of Troy Killough. See La. R.S. 14:30.1.
*110 In this assignment of error, Defendant also argues that, should the evidence support a verdict of second degree murder, the court should enter a verdict for the lesser included offense of manslaughter because Defendant was sufficiently provoked by Killough and, thus, murdered him in sudden passion and heat of blood.
Defendant relies on three events in support of this assertion: (1) Killough went to Watlington’s residence with the alleged intent of robbing the occupants therein; (2) Killough allegedly slept with Defendant’s girlfriend; and, (3) Killough grabbed the steering wheel of the vehicle in which he, Defendant, Watlington, Leone and Flores were riding, which caused a collision with another vehicle and endangered the safety of the occupants in the vehicle. Defendant argues that his act of shooting Killough was sufficiently provoked as a result of these actions of Killough; and, therefore, a judgment should have been rendered for the lesser included offense of manslaughter pursuant to La. R.S. 14:31 and La. C. Cr. P. art. 821.
As pointed out by the State, Flores testified that, prior to Defendant’s decision to shoot Killough, he (Flores) had recovered from the provocation of Killough’s alleged intended robbery because the beating had already taken place, such that Flores argued in favor of releasing Killough prior to 11fidriving to Greenwood. In addition, Defendant admitted in his recorded statement to Detective Richardson that the argument with Killough over the girl had taken place more than two weeks prior to the night he shot Killough. Defendant explained that, after the two ended them argument about Defendant’s girlfriend, he (Defendant) and Killough “made up and we hugged right there.” Finally, it is clear from the record that Killough’s act of lunging forward and grabbing the steering wheel of the Tahoe was in self-defense. Killough had already been beaten by the men once at Watlington’s house and was being beaten continuously as the men rode in the Tahoe toward Greenwood. Flores testified that it appeared that Killough was attempting to escape from and clearly did not want to be in the Tahoe. Furthermore, the vehicle that was damaged as a result of Killough’s act of causing the collision did not belong to Defendant, but was owned by Leone.
Accordingly, the facts and circumstances of this case, Flores’ testimony and Defendant’s own statements to Detective Richardson do not support Defendant’s argument that he shot Killough as a result of sudden passion or heat of blood arising from being sufficiently provoked by the actions of Killough; therefore, the evidence does not support a verdict for the lesser included offense of manslaughter. See La. R.S. 14:31; La. C. Cr. P. art. 821.
This assignment is without merit.
Assignment of Error Number Two (verbatim): The trial court erred in denying Defendant’s challenge of the State’s exclusion of jurors based solely on race.
In his second assignment of error, Defendant argues that the trial |17judge erred in ruling that Defendant did not make a prima facie showing in his Batson challenge that the State excluded venire members on the sole basis of race during jury selection. Defendant contends that the State used peremptory strikes to remove African-American prospective jurors from the jury; therefore, the State should have been required to provide race-neutral reasons for their exclusion. Batson v. Kentucky, supra. In particular, Defendant objected to the State’s removal of venire members Hall, Jones, Pullman and Brown.
The State points out that the court gave consideration to the pattern of peremptory strikes by the State and concluded that Defendant did not make a prima facie *111 showing that the State excluded the venire members on the basis of race. Batson v. Kentucky, supra. The State also notes that it excused a white female venire member and accepted as venire members a black female and a black male, who were then challenged by Defendant. In addition, the State provides race-neutral reasons for the peremptory challenges used on Hall, Jones, Pullman and Brown.
It is well settled that the use of peremptory challenges based solely on a juror’s race is prohibited. Batson v. Kentucky, supra. The Batson decision is codified in our law in La. C. Cr. P. art. 795.
In State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007), the Supreme Court set forth the process for reviewing a Batson claim:
A Defendant’s Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine |iswhether the Defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, “[t]he second step of this process does not demand an explanation that is persuasive, or even plausible”; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating “the persuasiveness of the justification” proffered by the prosecutor, but “the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.” (Internal citations omitted).
In State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, the Louisiana Supreme Court held that the sole focus of the Bat-son inquiry is on the intent of the prosecutor at the time he exercised his peremptory strikes. Batson v. Kentucky, supra; see also State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). The trial court plays a unique role in the dynamics of a voir dire, for it is this court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. State v. Juniors, supra; State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498.
The purpose of voir dire is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for the exercise of for cause and peremptory challenges. State v. Ball, 00-2277 (La.1/25/02), 824 So.2d 191089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002); State v. White, 39,745 (La.App.2d Cir.6/29/05), 907 So.2d 228. The scope of voir dire examination lies within the sound discretion of the trial judge, whose rulings will not be disturbed absent a clear abuse of that discretion. La. C. Cr. P. art. 786; State v. Ball, supra.
Defendant objected to the State’s removal of African-American venire members Hall, Jones, Pullman and Brown; however, the State provided race-neutral reasons for exercising its peremptory challenges over these four venire members.
*112 Venire member Hall had difficulty accepting the concept of “principals.” The State explained to venire members that “principals” were “all persons concerned in the commission of a crime whether present or absent and whether they directly commit the act constituting the offense, aid and abet in its commission or directly or indirectly counsel or procure another person to commit the crime.” Hall stated that she had a problem with the concept of “principals” because she has a brother serving time for murder and she feels like the prosecutors in his case did not treat him fairly.
Venire member Jones stated that she would be devastated if she was selected to be a member of the jury because she did not want the responsibility of holding someone’s future or life in her hands. Ve-nire member Pullman would only say that she could probably vote for a life sentence and the she was upset about her jury summons because of difficulties in obtaining child care. Finally, venire member Brown stated that she could not live with making a decision to send someone to jail for 12flthe rest of his or her life.
Given the responses of these venire members, which constituted the State’s purported nondiscriminatory reasons for their exclusion, we do not find that the trial judge erred in finding that Defendant did not make a prima facie case of discriminatory intent in support of his Baton challenge. Batson v. Kentucky, supra.
This assignment is without merit.
Assignment of Error Number Three (verbatim): The trial court erred in denying Defendant’s Motion to Suppress.
In his third assignment of error, Defendant argues that he was never advised of his Miranda rights prior to or during the interview which took place at the CID office on December 10, 2006. Defendant further contends that the manner in which he was tracked down and ordered to go to the CID office for a subsequent interview on December 11, 2006, vitiated the volun-tariness of his statements, despite his having been read his Miranda rights prior to the interview.
At a hearing on a motion to suppress a confession, the State bears the burden of proving the free and voluntary nature of the confession beyond a reasonable doubt. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, 00-1427 (La.5/11/01), 791 So.2d 1288.
In reviewing the correctness of the trial court’s pretrial ruling on a motion to suppress, the appellate court may review the entire record, including testimony at trial. State v. Green, supra; State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366, State v. Martin, 595 So.2d 592 (La.1992); |21State v. Young, 39,546 (La.App.2d Cir.3/2/05), 895 So.2d 753.
Great weight is placed upon the trial court’s ruling on a motion to suppress in regard to the finding of facts because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082. Accordingly, on appeal, the trial court’s ruling on a motion to suppress is reviewed under the manifest error standard with regard to factual determinations, while its findings of law are subject to de novo review. State ex rel. Thibodeaux v. State, 01-2510 (La.3/8/02), 811 So.2d 875; State v. Hemphill, 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263, writ denied, 06-2976 (La.3/9/07), 949 So.2d 441.
Before a confession can be introduced into evidence, the State must show that it was free and voluntary and *113 not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. See La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Bowers, 39,970 (La.App.2d Cir.8/19/05), 909 So.2d 1038; State v. Roddy, supra. The State must also establish that an accused who makes a statement during a custodial interrogation was first advised of his Miranda rights. Miranda v. Arizona, supra; State v. Bowers, supra; State v. Franklin, 35,268 (La.App.2d Cir.12/19/01), 803 So.2d 1057, writ denied, 02-0352 (La.2/7/03), 836 So.2d 85; State v. Roddy, supra.
Detective Escude testified that, on December 10, 2006, Defendant initially contacted the investigators and went voluntarily to the CID office to 122give a statement. At that time, Defendant was not in custody, was not a suspect, and the only interest investigators had in him was as a possible witness, so he was not advised of his Miranda rights. Detective Escude did not force or coerce Defendant into giving a statement, nor did he promise Defendant anything of value in exchange for giving a statement to the investigators.
On December 11, 2006, Detective Richardson conducted the second interview with Defendant and testified that, when Defendant proved to be unreachable on the phone, detectives located him at the Old Salem Apartments. Defendant was asked to accompany detectives to the CID office and he voluntarily agreed to do so. Defendant was transported to the CID office by Detectives Richardson and Morgan, but was not under arrest. Before commencing the interview, Defendant was advised of his Miranda rights and he signed a “rights sheet” indicating that he understood his rights. At no time did Detectives Richardson or Morgan threaten or coerce Defendant into giving a statement, nor did they promise him anything of value or make any promises of leniency in exchange for him giving a statement. Defendant did not invoke his right to counsel or ask that questioning be stopped at any time during the interview and he voluntarily admitted to shooting Killough.
Accordingly, we find that the State carried its burden of proving that Defendant was apprised of his Miranda rights and, furthermore, that Defendant’s confession was free and voluntary. La. R.S. 15:451; La. C. Cr. P. art. 703(D); Miranda v. Arizona, supra; State v. Bowers, supra. The trial | ¡.¿judge, therefore, did not err in denying Defendant’s motion to suppress.
This assignment is without merit.
Assignment of Error Number Four (verbatim): The sentence imposed is excessive for this offender and offense.
On November 10, 2009, the trial judge imposed upon Defendant the mandatory sentence for a second degree murder conviction, i.e., life imprisonment without benefit of probation, parole or suspension of sentence. See La. R.S. 14:30.1(B). Defendant alleges that this sentence is grossly disproportionate to the crime committed and. represents nothing more than the needless imposition of pain and suffering. Defendant further alleges that nothing in the record indicates that such a sentence is necessary to avoid further criminal activity by Defendant or damage to society.
La. R.S. 14:30.1(B) provides:
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not re- *114 qnired to list every aggravating or mitigating factor so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,-855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 07-0805 (La.3/28/08), 978 So.2d 297.
The goal of La. C. Cr. P. art. 894.1 is the articulation of the factual basis for a sentence, not the rigid or mechanical compliance with its 1 ^provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Landos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267, writ denied, 08-2697 (La.9/18/09), 17 So.3d 388. The important elements which should be considered are the defendant’s prior criminal record, the seriousness of the offense, the likelihood of rehabilitation and his per sonal history, including his age, family ties, marital status, health and employment record. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, unit denied, 07-0144 (La.9/28/07), 964 So.2d 351.
Second, a sentence violates La. Const, art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App.2d Cir] 254/2/97), 691 So.2d 864.
The record reveals that Defendant did not file a motion to reconsider sentence; therefore, he is relegated to a bare claim of constitutional excessiveness. La. C. Cr. P. art. 881.1; State v. Mims, 619 So.2d 1059 (La.1993). Furthermore, there is no need for the trial judge to justify a sentence under La. C. Cr. P. art. 894.1 when he is legally required to impose that sentence, such as the mandatory sentence of life imprisonment without benefit of probation, parole or suspension of sentence required for a conviction of second degree murder. See La. R.S. 14:30.1(B); State v. Wright, 42,956 (La.App.2d Cir.3/5/08), 978 So.2d 1062, writ denied, 08-0819 (La.10/31/08), 994 So.2d 532.
Mandatory sentences under La. R.S. 14:30 have been consistently upheld as constitutional and consistent with the federal and state constitutional provisions prohibiting cruel, unusual or excessive punishment. State v. Wright, supra; State v. Sims, 32,461 (La.App.2d Cir.10/27/99), 745 So.2d 151, writ denied, 99-3384 (La.5/12/00), 762 So.2d 11. The trial judge may only depart from the minimum mandatory sentence if he finds that the defendant presented “clear and convincing evidence” to rebut that presumption of constitutionality, which requires a showing that “[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature’s failure to assign [a sentence that is] meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the *115 case.” State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672.
| ¡.^Defendant has failed to present clear and convincing evidence demonstrating that he is “exceptional” and that the circumstances of this case warrant a downward departure from the mandatory minimum sentence pursuant to the statute. La. R.S. 14:30.1(B); State v. Wright, supra.
This assignment of error is without merit.

CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant, Thomas Payne Horne, are affirmed.
AFFIRMED.

. Detective Terry Richardson also participated in the interview that day.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

. Flores later testified that "mere” is slang for "kill.”